IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY SHELINE, | ) | Case No. 1:20-cv-2828 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| LYNEAL WAINWRIGHT, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

On August 29, 2007, first responders found the body of 67-year-old retiree Gwendolyn Bewley while responding to a house fire at her home. On September 8, 2007, Timothy Sheline, Bewley's front door neighbor, was found driving Bewley's rental car and arrested. A search of the car uncovered Bewley's credit cards and laptop. And Bewley pleaded no contest and was convicted of receiving stolen property and unauthorized use of a vehicle.

Meanwhile, the investigation into Bewley's death continued through 2014: (i) an autopsy revealed that Bewley had perished before the fire began; (ii) the Ohio State Fire Marshal determined that the fire was caused by someone setting fire to combustible material placed on top of Bewley's body; (iii) the Cuyahoga County Coroner's Office concluded that the cause of death was homicide; (iv) the Fairview Park Police Department found several inconsistencies in Sheline's account of where he was at the time of the fire; and (iv) a forensic examination into Bewley's laptop uncovered various transactions from Bewley to Sheline's accounts and several posthumous credit card transactions.

On December 30, 2014, Sheline was charged with and later found guilty by a jury of murder and aggravated arson.  And Sheline was sentenced to 20 years to life.  Sheline now seeks a writ of habeas corpus, under 28 U.S.C. § 2254, raising two claims for relief.  ECF Doc. 1.  Sheline asserts:

> **Ground One**: There was insufficient evidence to support Sheline's convictions (ECF Doc. 1 at 6; ECF Doc. 1-1 at 4–7; ECF Doc. 11 at 6–11).
>
> **Ground Two**: The delay between Sheline's September 2007 arrest and the December 2014 indictment violated his due process rights (ECF Doc. 1 at 8; ECF Doc. 1-1 at 7–8).

Respondent, Warden Harold May, filed a return of writ.[1]  ECF Doc. 7.  And Sheline filed a traverse.  ECF Doc. 11.

Because Sheline's claims are meritless, I recommend that the claims be DENIED and that Sheline's petition for a writ of habeas corpus be DENIED.  I further recommend that Sheline not be granted a certificate of appealability.

## I.    State Court History

### A.    First Trial Court Proceedings

On September 8, 2007, Sheline was arrested and charged with four counts of receiving stolen property and two counts of unauthorized use of a vehicle.  Docket for Cuyahoga Cnty. Ct. of Comm. Pleas, No. CR-07-501364, docket entry entered on 9/08/2007; *see also State v. Sheline*, 2010-Ohio-2458, ¶4 (Ohio Ct. App. 2010).  Sheline pleaded no contest; the trial court found him guilty as to all charges; and the court imposed a three-and-a-half-year sentence.  Docket for Cuyahoga Cnty. Ct. of Comm. Pleas, No. CR-07-501364, judgment entries entered on 8/19/2008 and 1/27/2009.  The final journal entry was entered on January 27, 2009.  *Id.*,

---

[1] Harold May is the current warden of Marion Correctional Institution, where Sheline is confined, and is therefore the proper respondent.  *Rumsfeld v. Padilla*, 542 U.S. 426, 435–36 (2004) (stating that the proper respondent in a habeas action "is the warden of the facility where the [petitioner] is being held").

judgment entry entered on 1/27/2009.  The Ohio Court of Appeals affirmed Sheline's convictions on June 17, 2010.  *Sheline*, 2010-Ohio-2458.

### B.  Second Trial Court Proceedings

On December 30, 2014, a Cuyahoga County, Ohio, grand jury issued an indictment that charged Sheline with one count of willful murder (Count One); one count of felony murder (Count Two); two counts of aggravated arson (Counts Three, Four, and Five); one count of felonious assault (Count Six); one count of theft (Count Seven); and one count of tampering with evidence (Count Eight).  ECF Doc. 7-1 at 4–6.  Counts One and Two related to the death of Bewley.  ECF Doc. 7-1 at 4.  Counts Three and Four pertained to firefighters David Stein and Steve Lee.  ECF Doc. 7-1 at 5.  The predicate felony for Count Two was felonious assault.  ECF Doc. 7-1 at 4.  And the offense date for each count was on or about August 29, 2007.  *See* ECF Doc. 7-1 at 4–6.  Sheline pleaded not guilty.  ECF Doc. 7-1 at 7.

On February 20, 2015, Sheline moved to dismiss the indictment.  ECF Doc. 7-1 at 8.  Sheline argued that the offenses for which he was charged in the 2014 indictment were based on the same operative facts as his 2007 charges.  ECF Doc. 7-1 at 10–11.  Thus, he argued that Counts Six through Eight were untimely under Ohio Rev. Code § 2901.13.  ECF Doc. 7-1 at 10.  He further argued that the preindictment delay as to remaining counts amounted to a due process violation.  ECF Doc. 7-1 at 11–12.  The state filed a response in opposition.  ECF Doc. 7-1 at 14–19.

On May 27, 2015, the trial court held a hearing on Sheline's motion to dismiss.  ECF Doc. 7-1 at 21; *see also* ECF Doc. 8-1 at 3 (transcript of proceedings).  Upon the state's request, the court dismissed Counts Six through Eight.  ECF Doc. 7-1 at 21; ECF Doc. 8-1 at 7.  The

court deferred ruling on the remainder of Sheline's motion.  ECF Doc. 8-1 at 10–11.  Sometime

later, the court denied Sheline's motion to dismiss.  *See* ECF Doc. 8-1 at 20.[2]

On October 23, 2017, Sheline's case went to trial.  Docket for Cuyahoga Cnty. Ct. of

Comm. Pleas, No. CR-14-590948, docket entry dated 10/23/2017; ECF Doc. 8-2 at 61.  The

evidence presented at trial, as described by the Ohio Court of Appeals, was as follows:

> {¶3} [Bewley] was a 67-year-old retiree.  After moving in with his brother, [Scott Sheline,] [Timothy Sheline] befriended [Bewley] and began assisting her with various organizational and financial matters.  In this capacity, [Sheline] had access to [Bewley's] credit cards.  Approximately two weeks before the August 29, 2007 incident, [Bewley] disputed one of the charges [Sheline] made using her credit card.  Scott testified at trial that [Bewley] confronted [Sheline] about the transaction in question and wanted him to get a job so that he could pay her back.

> {¶4} [Sheline] and [Bewley] had lunch together on August 29, 2007.  Thereafter, [Bewley] attended a skating lesson from approximately 1:00 to 1:40 p.m. in Brookpark, Ohio.  [Bewley] returned home after her lesson.  [Bewley's] friend, Lynn Malec, spoke with [Bewley] on the phone around 2:00 p.m.  According to Malec, [Bewley] ended the phone call abruptly, in the middle of their conversation.

> {¶5} First responders were dispatched to [Bewley's] house at approximately 4:45 p.m. regarding a report of a fire.  Investigators spoke with some of [Bewley's] neighbors, including Scott.  Police officer John Manion learned that [Sheline] had lunch with [Bewley] earlier that day.  Scott placed a phone call to [Sheline] and handed the phone to Officer Manion.  [Sheline] acknowledged that he had lunch with [Bewley] earlier that day before her skating lesson.  He also advised Officer Manion that he was in Michigan on business.

> {¶6} Lieutenant Paul Shephard of the Fairview Park Police Department spoke with [Sheline] about his whereabouts.  [Sheline] asserted that he left for Michigan at approximately 12:40 p.m., and that he was in Michigan at the time the fire broke out.

> {¶7} Fire investigators determined that the origin of the fire was [Bewley's] body and that the fire was deliberately set.  Furthermore, burning papers had been piled up on [Bewley's] body.  Investigators ruled out other potential causes, such as a kitchen accident, faulty appliance, and a smoking-related accident.

---

[2] The trial court indicated at a subsequent hearing that it had denied Sheline's motion to dismiss the indictment due to preindictment delay.  ECF Doc. 8-1 at 20.  However, a review of the available state court record revealed no journal entry to that effect or reasons for why Sheline's arguments were rejected.

{¶8} Frank Reitmeier, from the Ohio Fire Marshal's Office, testified regarding the cause and origin of the fire: "It's my opinion that this fire was incendiary, which means it was — it was started, a fire started by a person in an area that should not have been started."  * * * He went on, "[t]he area of origin would have been the pile of papers that were placed on top of the body, the dead body of Ms. Bewley."  * * *

{¶9} Reitmeier testified that on the evening of August 29, 2007, [Sheline] checked into a hotel in Toledo, Ohio at 8:49 p.m., using [Bewley's] credit card. He stayed at the hotel until September 7, 2007.  However, [Sheline] repeatedly checked out and then checked back in, occupying different rooms.  Reitmeier also determined that [Sheline] ate at four restaurants in the Toledo and Maumee, Ohio area using [Bewley's] card.

{¶10} Philip Dolence, of Dolence Electrical Consultants, testified that he investigates the origin and causes of fires.  State Farm Insurance Company requested that Dolence investigate the Bewley fire.  He conducted an investigation and determined that the origin of the fire was [Bewley's] body. Dolence provided the following testimony regarding the fire: "My opinion is that this was, in fact, based on the burn patterns and physical evidence that I had seen and examined, personally, that this was in fact an intentional act of arson, a deliberately set fire, based on the things that I have testified, examined, and know about this case."  * * *

{¶11} After reviewing [Sheline's] phone records, however, investigators discovered that [Sheline] was not in Michigan, as he claimed.  Rather, at the time the first responders were alerted to the fire, [Sheline] was in North Olmsted and Westlake, Ohio.  When Scott called [Sheline] at 4:45 p.m., phone records reveal that [Sheline] was in Sheffield, Ohio.

{¶12} Dr. Darin Trelka performed an autopsy in August 2007.  He explained that a lot of details were lost as a result of the extensive thermal injuries and charring to [Bewley's] body.  Dr. Trelka was unable to determine whether [Bewley] suffered any trauma due to the charring and thermal injuries.  Dr. Trelka opined that there was no evidence that [Bewley] died of natural causes.  He reviewed [Bewley's] medical records, which reflected that [Bewley] stopped smoking at the age of 45.  Dr. Trelka performed a toxicology test on [Bewley] which was negative for carbon monoxide.  This [led] him to believe that [Bewley] was dead before the fire started, as she did not breathe in any carbon monoxide. Dr. Trelka concluded that [Bewley's] cause of death was homicidal violence. * * *

{¶13} Detective Thomas Harrington of the Fairview Park Police Department examined [Bewley's] mail and subpoenaed [Sheline's] PayPal records, which investigators were interested in because Bewley's Discover credit card had been used for two PayPal transactions, one for $600 and another for $300, nearly one

week after her death.  * * * Detective Harrington determined that the $300 transaction was transferred to the account of one of [Sheline's] friends.  A PayPal account was set up in [Bewley's] name on September 4, 2007 — six days after her death, and the phone number listed for this account was [Sheline's] cell phone number.

{¶14} [Bewley's] AT&T MasterCard was used to make purchases at gas stations, a pornography website, Meijer's, and Walmart, from September 4 to September 14, 2007.  Detective Harrington also reviewed documents from [Sheline's] Rewards 660 account.[]  On August 28, 2007, $134.64 was credited to [Sheline's] rewards account from [Bewley's] credit card; $167.71 on August 13; and several attempts were made to credit [Sheline's] account using [Bewley's] AT&T MasterCard after her death, but they were declined.

{¶15} Detective Harrington reviewed documents from [Bewley's] Discover credit card account.  These documents included a dispute letter dated August 25, 2007, and reflected a PayPal charge on September 5, 2007.  Detective Harrington reviewed documents from [Sheline's] Sears Gold MasterCard.  These documents reflected charges of $311.30 to [Sheline's] Rewards 660 account on July 28 and August 13, 2007; and a charge $134.64 to [Sheline's] Rewards 660 account on August 28, 2007.  Finally, Detective Harrington reviewed documents from [Bewley's] Citibank credit card, which included a dispute letter for security services.

{¶16} [Sheline] was arrested on September 8, 2007.  At the time of his arrest, [Sheline] was driving [Bewley's] rental car, he had three of [Bewley's] credit cards and her laptop computer in his possession, and investigators found credit card receipts from the Toledo area inside the vehicle.  Lieutenant Shephard testified that a white T-shirt and pair of jeans were recovered from the vehicle's trunk.  He explained, "[t]he white T-shirt and jeans were sort of soiled.  They were washed, but they were dirty.  And when you looked at it there was what appeared to be dried blood on it."  * * *

{¶18} Thereafter, in September 2014, a forensic analysis of [Bewley's] laptop computer … was conducted.  The forensic examination revealed that there was a lot of activity on the computer that began on August 29 and 30, 2007.  Specifically, the laptop was used to access banking sites, Western Union, Washington Mutual, a "Rewards 660" website, and PayPal.  Money was extracted from a credit card linked to [Bewley] on September 5, 2007.  Investigators determined that these sites were accessed by accounts that were traced back to [Sheline].

ECF Doc. 7-1 at 191–96 (internal citations and footnote omitted).[3]

Geoffry Kendel testified that at approximately 3:40 p.m., on August 29, 2007, he saw a man walk to Bewley's porch, snatch her mail, and go inside her house. ECF Doc. 8-4 at 63–64, 66–67. Kendel believed the person to be in his late 40s, between 5'8" and 5'9", and 200 to 210 pounds. ECF Doc. 8-4 at 84.

Jeffrey Clegg, Sheline's brother-in-law, testified that between 4:00 p.m. and 5:00 p.m., on August 29, 2007, he encountered Sheline waiting at his house in Ottawa Lake, Ohio. ECF Doc. 8-10 at 115–16.

And Jason Spang testified to a previous fire involving Sheline. Spang testified that Sheline dated his mother in the late 1980s, ultimately moving in with them. ECF Doc. 8-9 at 213–15. Spang testified that in 1989 he confronted his mother because of money he suspected Sheline had taken from his and his brother's rooms, and Sheline moved out. ECF Doc. 8-9 at 217–18. Sometime later Spang's house caught fire, which the fire department determined started from a furnace Sheline had worked on earlier that day and was caused by arson. ECF Doc. 8-9 at 219–21. Sheline subsequently "accepted responsibility" for the arson. ECF Doc. 8-9 at 224. Spang testified that his mother's relationship with Sheline soured and eventually ended. ECF Doc. 8-9 at 222. Sheline, however: (i) stole her car; (ii) broke into her rental home; (iii) stole all of her belongings; and (iv) totaled her car. *Id.*

The jury found Sheline guilty on all charges. ECF Doc. 7-1 at 76; ECF Doc. 8-11 at 131–32. And the trial court sentenced Sheline to 20 years to life. ECF Doc. 7-1 at 77; ECF Doc.

---

[3] These factual findings are presumed correct unless Sheline rebuts them with clear and convincing evidence. 28 U.S.C. § 2554(e)(1); *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003); *Burt v. Titlow*, 571 U.S. 23, 18 (2013).

8-11 at 160.  The journal entry imposing Sheline's convictions was entered on November 30, 2017.  ECF Doc. 7-1 at 77–78.

### C.    Direct Appeal

On December 26, 2017, Sheline, through new counsel, appealed his convictions.  ECF Doc. 7-1 at 79.  Sheline's merits brief asserted eight assignments of error, two of which are relevant – and repeated – here: (ii) there was insufficient evidence to support his convictions; and (vi) preindictment delay violated his due process rights.  ECF Doc. 7-1 at 90–91, 118–22, 127–28.

In support of his sufficiency of the evidence assignment of error, Sheline argued that the state failed to prove either willful or felony murder because: (i) there was no evidence that Bewley experienced any act of violence prior to her death; (ii) there was considerable evidence suggesting that she died of natural causes; and (iii) there was no evidence linking Sheline to the crime scene.  ECF Doc. 7-1 at 120–21.

Sheline also argued that the state failed to prove aggravated arson because: (i) there was no evidence that he knowingly created a substantial risk of serious physical injury to the firefighters; (ii) there was no evidence that he knowingly caused physical harm to Bewley's home; (iii) the firefighters did not require medical treatment; (iv) it was plausible that the fire was started by a cigarette or something in Bewley's kitchen accidentally catching fire; and (v) even if the fire had been deliberate, there was no evidence that he was the one who started it. *Id.*

In support of his preindictment delay assignment of error, Sheline argued that the over seven-year delay between his arrest and 2014 indictment prejudiced his defense because: (i) he was deprived access to "other suspect's" phone records and the ability to obtain alibi evidence;

(ii) the crime scene was remodeled; (iii) witnesses' memories had faded; and (iv) the state's

evidence in 2014 was "essentially the same" as the evidence it had in 2007.  ECF Doc. 7-1 at

127–28.

The state filed an appellee brief, to which Sheline replied.  ECF Doc. 7-1 at 132–86.  On

February 14, 2019, the Ohio Court of Appeals overruled Sheline's assignments of error and

affirmed his convictions.  ECF Doc. 7-1 at 188–258; *see also State v. Sheline*, 2019-Ohio-528

(Ohio Ct. App. 2019).  In rejecting Sheline's sufficiency of the evidence assignment of error,

with respect to his murder convictions, the court reasoned:

> **{¶71}** As noted above, Dr. Trelka explained that he was not able to determine
> much by examining the skin on [Bewley's] scalp, face, and neck due to the extent
> of the charring from the fire.  The extensive charring and "thermal artifacts"
> affected his ability to detect any trauma that [Bewley] may have suffered.  He
> testified that "a lot of detail was — was covered up by the thermal injury" and
> that "60 percent of [her body's] surface was charred."  * * * The charring
> primarily occurred on [Bewley's] upper torso, face, and head.  Based on
> Dr. Trelka's testimony regarding the condition of [Bewley's] body and the
> evidence that was lost in the fire, [Sheline's] reliance on the lack of fatal wounds
> observed during the autopsy is misplaced.

> **{¶72}** Although the state did not present direct evidence establishing that
> [Sheline] murdered [Bewley] and started the fire inside her house, it is well-
> established that a conviction can be sustained based on circumstantial evidence
> alone.  * * * In fact, circumstantial evidence may be as persuasive as, or even
> more persuasive than direct evidence. * * *

> **{¶73}** [W]e find that the state presented sufficient circumstantial evidence, if
> believed, to support [Sheline's] murder convictions.  First, the state presented
> evidence regarding [Sheline's] opportunity to commit murder, specifically,
> testimony placing [Sheline] at [Bewley's] house on the day of the August 29,
> 2007 incident.  [Sheline] informed Officer Manion that he had lunch with
> [Bewley] before her skating lesson at 1:00 p.m.  * * *

> **{¶74}** Although [Sheline] asserted that he left for Michigan around 12:40 p.m.
> on the day of the incident, and that he was in Michigan at the time of the fire …
> [Sheline's] cell phone records indicate that he was in North Olmsted and
> Westlake.  [Bewley] resided in Fairview Park, Ohio.  North Olmsted adjoins
> Fairview Park to the southwest, and Westlake adjoins Fairview Park to the
> northwest.  Detective Harrington testified that the fire started "sometime around

four-ish[.]"  * * * When Scott called [Sheline] at 4:55 p.m., after first responders had been dispatched to [Bewley's] house at 4:45 p.m., [Sheline's] cell phone records indicate that he was in Sheffield, Ohio.  * * *

{¶75} [Sheline's friend], Lynn Malec, testified that she spoke with [Bewley] on the phone on the day of the incident around 2:00 p.m., after her skating lesson. Malec recalled that the [Bewley] abruptly ended the phone call in the middle of their conversation: "we were just in the middle of something almost and she said: Oh, I have to go.  Almost as if somebody was, like, at the door or something came up."  * * *

{¶76} Based on this circumstantial evidence, a reasonable inference could be made that after [Bewley] initially confronted [Sheline] about the charges on her credit card, she brought the issue up again during their lunch, or even tried to retrieve her credit cards from [Sheline]; [Sheline] was upset by [Bewley's] confrontation; as a result, [Sheline] returned to [Bewley's] house after her skating lesson, causing [Bewley] to abruptly end her phone call with Malec; [Sheline] killed [Bewley]; and then [Sheline] set [Bewley's] body on fire in order to cover up the evidence.

{¶77} The state also presented evidence regarding a motive for [Sheline] to harm [Bewley].  [Sheline] had access to [Bewley's] credit cards, [Bewley] disputed at least one of the credit card charges approximately two weeks before the August 29, 2007 incident, and she confronted [Sheline] about his use of her credit card prior to the incident.  * * *.

{¶78} Scott testified that [Sheline] was using [Bewley's] credit card without her consent and that [Bewley] confronted [Sheline] about the charges incurred on her credit card.  He explained that [Bewley] wanted [Sheline] to get a job so that he could pay her back.  * * *

{¶79} Scott's testimony was supported by the testimony of Detective Harrington.  Detective Harrington testified that he retrieved and examined [Bewley's] mail and also reviewed [Bewley's] credit card statements.  The documentation for [Bewley's] Discover card included an August 25, 2007 dispute letter pertaining to a credit card charge that [Bewley] was disputing.  * * * The documentation for [Bewley's] Citibank credit card included a dispute letter for security services.  * * * Finally, as noted above, the record reflects that [Sheline] continued to use [Bewley's] credit cards after the August 29, 2007 incident.

{¶80} Finally, [Sheline] argues that the evidence indicates that [Bewley] died from natural causes, and/or that the fire started accidently from a cigarette or in [Bewley's] kitchen.  Furthermore, he appears to suggest that the evidence indicates that Scott was responsible for [Bewley's] death and the fire in her home. These arguments pertain to the manifest weight of the evidence and are not properly raised in a sufficiency context.

{¶81} Considering all of the aforementioned circumstantial evidence in a light most favorable to the state … we find that reasonable minds could conclude that [Sheline] had both the opportunity and a motive for killing [Bewley] and setting her body on fire and, thus, that [Sheline] was, in fact, the person who did so. * * *

ECF Doc. 7-1 at 218–22.

With respect to Sheline's aggravated arson convictions, the Ohio Court of Appeals stated:

{¶86} Stein testified that he suffered a fourth-degree burn to his hand while fighting the fire at Bewley's house.  Stein explained that his fourth-degree burn went through the skin on his hand and killed the nerve underneath the skin.  * * *  Stein asserted that he was treated for the injury to his hand at St. John's Medical Center in Westlake, Ohio, and that he missed approximately three weeks of work due to his injury.  * * *

{¶87} Lee testified that he suffered a second-degree burn to his face while fighting the fire at Bewley's house.  Lee explained that he received treatment for the injury to his face at the hospital, he missed two weeks of work due to his injury, and that he suffered pain and "blistering" to his face as a result of the second-degree burn.  * * *

{¶88} Finally, as noted above, Reitmeier and Dolence both opined that the fire in Bewley's house was intentionally set, with the origin of the fire being [Bewley's] body — specifically, her upper torso and head. * * *

{¶89} The testimony of Reitmeier and Dolence regarding the cause and origin of the fire, and the testimony of Stein and Lee regarding the injuries they sustained while fighting the fire, if believed, is sufficient to support [Sheline's] convictions for aggravated arson on Counts 3 and 4.

* * *

{¶93} [With respect to Count 5], it would be ludicrous to suggest that the fire did not result in loss to value of the [Bewley's] house and/or did not interfere with the use of enjoyment of the house.  Further, as noted above, both Reitmeier and Dolence testified, based on their experience investigating fires and the investigation they conducted of the Bewley fire, that the fire was intentionally set. This testimony, if believed, is sufficient to support [Sheline's] conviction for aggravated arson on Count 5.  * * *

ECF Doc. 7-1 at 223–25.

And in rejecting Sheline's preindictment delay assignment of error, the Ohio Court Ohio

Appeals reasoned:

> **{¶156}** After reviewing the record, we find that [Sheline] failed to meet his
> burden of actual prejudice.  [Sheline's] preindictment delay argument is premised
> on the speculation that (1) the phone records of Scott and/or [Norm] Skuderin
> would have been available to show that they were in the vicinity of Bewley's
> house at the time the fire broke out, and (2) that other evidence existed regarding
> his whereabouts at the time of the incident.  This type of speculation is
> insufficient to demonstrate actual prejudice.  * * * Furthermore, Scott and
> Skuderin testified at trial regarding their whereabouts, and [Sheline's] brother-in-
> law Jeffrey Clegg and Lieutenant Shephard testified about [Sheline's]
> whereabouts at the time of the incident.
>
> **{¶158}** [Regarding Sheline's] arguments of faded memories and the fact that
> Bewley's house had bene remodeled, [Sheline] fails to identify what missing
> evidence could have been obtained from [Bewley's] house and offered at trial to
> assist in his defense had the house not been remodeled.
>
> **{¶159}** For all the foregoing reasons, we find that the trial court did not err by
> denying [Sheline's] motion to dismiss.  [Sheline] failed to demonstrate actual
> prejudice, and thus, he was not entitled to dismissal based on preindictment delay.
> * * *

ECF Doc. 7-1 at 247–48.

On February 25, 2019, Sheline filed an Ohio App. R. 26(A) application for

reconsideration and/or en banc consideration.  ECF Doc. 7-1 at 259–68.  The state filed an

opposition brief.  ECF Doc. 7-1 at 271–76.  And on April 18, 2019, the Ohio Court of Appeals

denied both requests.  ECF Doc. 7-1 at 278–79.

On July 22, 2019, Sheline appealed to the Ohio Supreme Court.  ECF Doc. 7-1 at 281–

82.  Sheline's memorandum in support of jurisdiction asserted five propositions of law, four of

which are relevant to Sheline's federal habeas claims:

> **Proposition of Law No. 1**: As a matter of law, a murder conviction rests on
> insufficient evidence and violates due process under the Fifth and Fourteenth
> Amendments to the Constitution of the United States as well as Article I Section
> 10 of the Ohio Constitution when there is no evidence that the deceased was the
> victim of homicide.  ECF Doc. 7-1 at 290–93.

12

**Proposition of Law No. 2**: A murder conviction is based on insufficient evidence when the only relevant evidence indicates that someone other than the defendant could have committed the crime.  ECF Doc. 7-1 at 293–94.

**Proposition of Law No. 3**: When the only evidence that the accused is guilty is that there is no better explanation for the events, the evidence of guilt is insufficient.  ECF Doc. 7-1 at 294–95.

**Proposition of Law No. 5**: An unjustifiable delay between the commission of an offense and a defendant's indictment which results in actual prejudice to the defendant, is a violation of the right to due process under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.  ECF Doc. 7-1 at 298–99.

Sheline's arguments in support of his propositions of law were largely the same as those he raised in his Ohio Court of Appeals brief.  ECF Doc. 7-1 at 290–95, 298–99.  The state filed a memorandum in response.  ECF Doc. 7-1 at 301–10.  And on October 1, 2019, the Ohio Supreme Court declined to accept jurisdiction.  ECF Doc. 7-1 at 311.

## II.    Analysis

### A.    Ground One

In his Ground One claim, Sheline argues that his due process rights were violated because the state presented insufficient evidence to establish his guilt, reiterating his arguments that there was no evidence: (i) of what was Bewley's cause of death; (ii) linking Sheline to either the crime scene or the fire; or (iii) of what caused the house fire.  ECF Doc. 1-1 at 4–7; ECF Doc. 11 at 1–4, 6–11.  Warden May responds that the Ohio Court of Appeals reasonably determined that there was.  ECF Doc. 7 at 15–26.  And in his traverse, Sheline replies that the court's sufficiency determination rested on inferences without evidentiary support.  ECF Doc. 11 at 10–11.

In reviewing a claim of lack of sufficient evidence, federal courts apply the *Jackson v. Virginia* standard: "whether, after viewing the evidence in the light most favorable to the

13

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (emphasis in original).  This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  And in applying this standard, courts are mindful that "it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

Because the Ohio Court of Appeals addressed Sheline's Ground One claim on the merits, a writ of habeas corpus can issue only if that decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d).  So long as "fairminded jurists" could disagree on whether the state court correctly decided the matter, we may not grant relief. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  "All told, [Sheline's claim] faces two layers of judicial deference, one premised on deference to the jury under *Jackson*, the other premised on deference to the jury under AEDPA." *Potts v. Wainwright*, No. 21-3293, ___ F. App'x ___, 2022 U.S. App. LEXIS 13538, at *5 (6th Cir. 2022) (internal quotation marks omitted).

Under subsection (A) of Ohio's murder statue: "No person shall purposely cause the death of another." Ohio Rev. Code § 2903.02(A).  "A person acts purposely when it is [his] specific intention to cause a certain result." Ohio Rev. Code § 2901.22(A).  Subsection (B) of Ohio's murder statute further provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." Ohio Rev. Code § 2903.02(B).  An eligible predicate felony offense to subsection (B) is felonious assault, *i.e.* the causing of "serious

14

physical harm to another." Ohio Rev. Code § 2903.11(A)(2).  And Ohio's aggravated arson statute makes it unlawful for a person, by means of fire or explosion, to create a risk of serious physical harm to another or cause physical harm to an occupied structure.  Ohio Rev. Code § 2909.02(A)(1)-(2).

Ohio courts recognize that arson cases often rely on circumstantial evidence exclusively. *State v. Rodano*, 2017-Ohio-1034, ¶37 (Ohio Ct. App. 2017).  Of particular relevance in an arson case is evidence establishing "motive and opportunity."  *State v. Lamb*, 2018-Ohio-3089, ¶105 (Ohio Ct. App. 2018) (quoting *State v. Pointer*, 2014-Ohio-4081, ¶12 (Ohio Ct. App. 2014)).

The Ohio Court of Appeals' denial of Sheline's Ground One claim was neither contrary to, nor an unreasonable application of, *Jackson*.  28 U.S.C. § 2254(d)(1).  Although the court cited state law to articulate the standard for evaluating sufficiency-of-the-evidence claims, the standard that it applied was consistent with *Jackson*.  *Compare* 443 U.S. at 319, *with* ECF Doc. 7-1 at 217 (quoting *State v. Keller*, 2018-Ohio-4107, ¶19 (Ohio Ct. App. 2018)); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that a state court doesn't need to cite the applicable federal decision but need only apply a rule consistent with that opinion).

The Ohio Court of Appeals' decision also did not involve an unreasonable application of *Jackson* or an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  The evidence the court cited and the trial evidence as a whole was evidence from which a rational trier of fact could conclude that Sheline had the motive and opportunity to kill Bewley and set her on fire. *See Lamb*, 2018-Ohio-3089, ¶105.  Evidence from which a rational trier of fact could find motive included: (i) Detective Harrington's testimony that Bewley's credit cards had been used on July 28, August 13, and August 28, 2007 to make payments on Sheline's credit card account (ECF Doc. 8-8 at 141–42, 147, 156); (ii) Detective Harrington's testimony that Bewley's credit card

was used to make a payment on August 29, 2007 to Verizon – despite her not having a Verizon phone, while Sheline did (ECF Doc. 8-8 at 131; ECF Doc. 8-9 at 9); (iii) Bewley's August 25, 2007 letter to Discover disputing a charge made on her credit card (ECF Doc. 8-8 at 150–51); (iv) Citibank's August 28, 2007 letter informing Bewley of the July 28 charge (ECF Doc. 8-8 at 158–59); (v) Scott's testimony that Bewley confronted Sheline two weeks before the fire about Sheline's misuse of her credit card, and her demand for repayment (ECF Doc. 8-7 at 95); (vi) Scott's and Malec's testimony that Bewley would not hesitate to call someone out for taking advantage of her (ECF Doc. 8-4 at 188; ECF Doc. 8-7 at 94); (vii) Karen Walker's testimony that Sheline shoved her after she accused him of befriending Bewley under false pretenses (ECF Doc. 8-7 at 14); and (viii) Spang's testimony of Sheline's arson, burglary, and theft following a deterioration in Sheline's relationship with Spang's mother (ECF Doc. 8-9 at 219–22, 224).

Evidence from which a rational trier of fact could find opportunity included: (i) Officer Manion's testimony that on August 29, 2007, around 5:15 p.m., Sheline said (a) he'd had lunch with Bewley, (b) left for Michigan at 12:45 p.m., and (c) was in Michigan on business with Olan Mills (ECF Doc. 8-3 at 221–23); (ii) Detective Harrington's testimony that, according to Sheline's phone records, that Sheline was instead in the vicinity of North Olmsted and Westlake and only arrived to Toledo at 7:10 p.m. (ECF Doc. 8-8 at 164, 175; ECF Doc. 8-9 at 201, 204); (iii) Detective Harrington's testimony that Olan Mills no longer existed at the time of the offense and that Olan Mills denied ever having employed Sheline (ECF Doc. 8-9 at 31, 137–38); (iv) Clegg's testimony that he encountered Sheline at his house in Ottawa Lake, Ohio, on August 29, 2007, between 4:00 p.m. and 5:00 p.m. (ECF Doc. 8-10 at 114–16); (v) Malec's testimony that Bewley abruptly ended their phone conversation around 2:00 p.m. (ECF Doc. 8-4 at 96); (vi)  Kendel's testimony that on August 29, 2007, around 3:40 p.m., he saw a man approximately

5'8" tall snatch Bewley's mail and go inside her house (ECF Doc. 8-4 at 63–64, 66–67, 84); and (vii) Scott's testimony that Sheline likely measured 5'7" (ECF Doc. 8-7 at 104).

And to both sets of evidence must be added: (i) Dolence's and Reitmeier's opinion that the fire was caused by someone laying paper on Bewley's body and igniting it (ECF Doc. 8-5 at 84–86; ECF Doc. 8-8 at 37); (ii) Dr. Trelka's and Dr. Thomas Gibons's opinion that Bewley's death was not caused by natural disease (ECF Doc. 8-5 at 71–72, 80–84; ECF Doc. 8-10 at 185–86); (iii) Reitmeier's testimony that Sheline repeatedly checked in and out of different rooms at the same hotel between August 29 and September 7, 2007 (ECF Doc. 8-8 at 41–43); (iv) Detective Harrington's testimony that on September 4, 2007 Sheline set up a PayPal account in Bewley's name and used Bewley's credit card to transfer $900 (ECF Doc. 8-8 at 122); (v) Detective Harrington's testimony that transactions continued to be made with Bewley's credit cards after her death (ECF Doc. 8-8 at 142, 151); and (vi) Officer Shephard's testimony that at the time of Sheline's arrest he was still driving Bewley's rental car and was found with her credit cards under the floor mat (ECF Doc. 8-9 at 141–45).

Taken all together, the state court's determination that a rational trier could find based on the evidence above that Sheline caused Bewley's death and started the fire was not beyond any possibility of fair-minded disagreement. *See Harrington*, 562 U.S. at 101.

I recommend that Sheline's Ground One claim be DENIED for lack of merit.

### B.    Ground Two

In his Ground Two claim, Sheline argues that the delay between when the murder and aggravated arson was alleged to have occurred and his indictment was unjustified and violated his rights under the Fifth and Fourteenth Amendments.  ECF Doc. 1-1 at 7–8.  As a consequence, he argues that his ability to defend against the charges was hampered, reiterating that

17

independent evidence establishing his whereabouts was no longer available, the crime scene was remodeled, and witnesses' memories had faded.  ECF Doc. 1-1 at 8.

Warden May responds that the Ohio Court of Appeals reasonably determined that Sheline failed to meet his burden to show actual prejudice.  ECF Doc. 7 at 27–31.  The warden alternatively argues that Sheline has failed to establish that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, because there is a circuit split on the standard used to determine that the preindictment delay was a delay tactic to gain advantage over the defendant.  ECF Doc. 7 at 31–36.

The standard by which constitutional claims of preindictment delay are analyzed comes from *United States v. Marion*, 404 U.S. 307 (1971), and *United States v. Lovasco*, 431 U.S. 789 (1977).  *United States v. Brown*, 498 F.3d 523, 528 (6th Cir. 2007); *see also New v. Black*, No. 21-3376, 2021 U.S. App. LEXIS 35900, at *3 (6th Cir. Dec. 3, 2021) (unreported).  To establish a due process violation based on preindictment delay, a defendant must show: (i) "substantial prejudice to [his] rights a fair trial;" *and* (ii) that "the delay was an intentional device to gain tactical advantage over the accused."  *Marion*, 404 U.S. at 324; *Brown*, 498 F.3d at 528 (noting that the Sixth Circuit has interpreted *Marion* and *Lovasco* to require both elements to be established in order for the delay to amount to a due process violation).

To establish "substantial prejudice," the defendant cannot rely on the mere possibility "that memories will dim, witnesses become inaccessible, and evidence be lost."  *Marion*, 404 U.S. at 324–26.  He must instead show "*actual prejudice* in presenting his defense."  *United States v. Gouveia*, 467 U.S. 180, 192 (1984) (emphasis added).  To establish the second element, the Supreme Court distinguishes between mere "investigative delay" and delay undertaken for tactical advantage.  *Lovasco*, 431 U.S. at 795.  A prosecutor does not deviate from "elementary

standards of 'fair play and decency' [when] he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Id.* Mere negligence or recklessness by the prosecutor at the potential prejudice to the defendant is not enough. *United States v. Rogers*, 118 F.3d 466, 476 (6th Cir. 1997). The defendant must show that the state "purposely delayed in order to gain a tactical advantage over" him. *United States v. Lash*, 937 F.2d 1077, 1088 (6th Cir. 1991). All told, the defendant faces what the Sixth Circuit has described as a "nearly insurmountable" burden when attempting to prove prejudicial preindictment delay. *Rogers*, 118 F.3d at 477 n.10.

The Ohio Court of Appeals' denial of Sheline's Ground Two claim was neither contrary to, nor an unreasonable application of, *Marion* and *Lovasco*. 28 U.S.C. § 2254(d)(1). The appellate court explicitly cited and applied the *Marion* and *Lovasco* two-pronged preindictment delay standard, as articulated by the Ohio courts. ECF Doc. 7-1 at 246–47 (quoting *State v. Walker*, 2018-Ohio-3669, ¶¶15–18 (Ohio Ct. App. 2018)). And the Ohio Court of Appeals reasonably determined that Sheline failed to establish prejudice. ECF Doc. 7-1 at 247–48.

Fair-minded jurists could disagree on the correctness of the Ohio Court of Appeals' prejudice determination. *See Harrington*, 562 U.S. at 101. Then, as now, Sheline's prejudice argument was that he was deprived of access to: (i) evidence with which to establish an alibi; (ii) the other suspects' phone records; (iii) the un-remodeled crime scene; and (iv) un-faded witness memories. ECF Doc. 7-1 at 127–28; *see also* ECF Doc. 1-1 at 8. But as the state court noted, Sheline's argument amounted to speculation regarding what evidence possibly could have existed regarding his and others' whereabouts at the time of the fire and regarding the possibility that valuable evidence was lost in the gap between his arrest and indictment. ECF Doc. 7-1 at 247–48. Such speculation is not enough to establish the requisite degree of prejudice. *See*

*Marion*, 404 U.S. at 325–26.  And without prejudice the state court determined, consistent with *Marion* and *Lovasco*, that Sheline failed to establish a due process violation.  *See Brown*, 498 F.3d at 528.  Thus, the state court's denial of Sheline's Ground Two claim was not beyond any possibility of fair-minded disagreement.  *See Harrington*, 562 U.S. at 101.

I recommend that Sheline's Ground Two claim be DENIED for lack of merit.

**III.  Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(1)(A), this court will grant a certificate of appealability ("COA") for an issue raised in a §2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right.  *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020).  A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

If the Court accepts my recommendations, Sheline will not be able to show that the Court's rulings on his claims are debatable among jurists of reason because both of Sheline's claims are meritless.  Because of jurists of reason would not find debatable that relief is not available for any of the claims raised in Sheline's petition, I recommend that no COA issue in this case.

## IV.    Recommendation

Because Sheline's claims lack merit, I recommend that Sheline's claims be DENIED and that his petition for writ of habeas corpus be DENIED.  I further recommend that Sheline not be granted a COA.

Dated: November 2, 2022

Thomas M. Parker
United States Magistrate Judge

_____

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).